Good morning, Your Honors. May it please the Court, my name is Howard Bashman and I represent the plaintiffs' appellants, Kenneth and Rose Mann, as parents and guardians of Sheldon Mann. With the Court's permission, I'd like to reserve three minutes for rebuttal. Sure. It's a real honor. You're well known to this Court. I don't think you've ever argued before a panel that I've paneled before, so this is a delight. Not to say that your case has merit or doesn't have merit, but it's nice to see you arguing before a panel I'm on. Go ahead. Thank you, Judge McKee. You may not thank me when your argument is finished. As Your Honors are aware... Let me ask this. Yes. Really, this case, from your perspective, boils down to qualified immunity, and there were some admissions here that actually surprised me. So let's assume that the conduct shocks the conscience. Right. Which, I'm not sure if you get past that hurdle with the jury or not, but let's assume that this injury occurred in 2011. What law, point me or point us to the law that was clear in 2011 that should have informed this coach and these coaches that by allowing this young man to go back into practice after the first or second hit, however many hits he suffered, it was shocking to conscience and he shouldn't have done that. Yes. Can you back up for a second? So the plaintiff, the young man, is helpless and incapacitated, and this court has two precedents, Neep versus Tedder. He was very rude, and that's a really weird case where police officers basically let an obviously intoxicated person walk by himself on a very, very busy highway, and it was obvious that they were subjecting her to a danger there. Right. On the level of manslaughter, that's beyond negligence. And just to finish the answer. And L.R. L.R., right. That taxes, you know, you just don't do that. You just don't turn a child over to someone who you do not know whether they're authorized to take the child or not. So there's a kind of a common sense antenna that goes up with both these situations that, I mean, it's tragic what happened here, but football, everybody gets hit. Everybody gets hit in football. There is hitting in football, no doubt. My son didn't like kids, so he stopped playing football. So the issue here is if we have someone who's visibly helpless and incapacitated, and the testimony from the players. Helpless and incapacitated. What is the most damning evidence? What is the most damning? The evidence is that he was dazed, disoriented, dizzling, stumbling, seeing stars, and helpless to avoid. So when he came out or 20 plays later when he was going back in? Well, again, how many plays later is one of the issues, in fact, in the case. The coach, Wachowiak, the second W's pronounces a V, says that it was 20 plays later. But the other witnesses say it was a very short time. Let's assume it was the next play, that he's dazed, and you use the term helpless, which is the language in Coney Island, we've got a kindergarten. Right, right. And in Mead. And Mead, if you have an adult. This is on a football field, and the term, and I hate the term, quote, stinger, close quote, which is what athletics folks use to cover all assembly injuries. But he had a stinger, he was dinged. Right. We say it was concussion-like symptoms after the first hit, and that that meant that he should have been sent for testing right away as opposed to being told to keep playing. The cases that the other side rely upon in distinction, the Spady case, which Judge Manesky was the author of, and the Hinchinberger case, a non-presidential case that Judge Rendell was the author of, those two cases both involved students who were injured in a single occurrence. There's nothing to preview that. Right. The students say he was not a swimmer, but he only ducked under the water one time, the case says. And in Hinchinberger, the coach was having the gymnastics team try a new stunt, as it was called, but no one had ever been injured up until the point that the young lady who was thrown up in the air was missed and hit her head and body on the floor. So that is the key distinction is that this court, both in the school. And what we have here, we have here something that, especially in 2011, probably thousands of kids could have been in this poor, unfortunate young man's situation, whether on a football field, either in a game or a practice, got a hard hit which resulted in visible signs of a concussion. Some who had said, get back in there, keep playing, keep practicing, which would suggest to me that you would accept my characterization of the frequency. And if that happened, then how do you get past qualified immunity? I think that actually if you look at Judge Wachowiak's testimony, it actually really helps the plaintiff. It does. He says that if the student is exhibiting concussion-like symptoms, he's supposed to be taken out and not put back in. And then we have the fact issue of whether or not the student was exhibiting those symptoms or not. But presumably he was. You've got negligence. Maybe even gross negligence. If you have someone who's obviously helpless, which is plaintiff's version of the fact that the testimony from students supports, and even words out of Coach Wachowiak's own mouth that another coach testified to in deposition, where he said there were two really hard hits, we think that if Coach Wachowiak wants to clear his name, have the case go before the jury. Maybe I can go back to Judge McKee's original question, and that is, what was the state of law in November 1 of 2011, such that a reasonable coach would know that it was unconstitutional, a violation of the substantive due process rights of Sheldon, to put him back into practice? Right. I'm going to answer that directly, but just as a preface to that, I believe that the legal test is clear. Does that mean that you're going to answer any of my questions directly? I'm just saying I want to take a slight detour before I get to it, which is that the issue is clearly established rights are those that a reasonable official in the defendant's position would have known, and that someone who would put the student back in when he was obviously incapacitated would be a plainly incompetent official. We're talking about the law. Existing precedent must have placed the statutory or constitutional question beyond debate. So now I'm going to answer that question. Precedent. And we're talking about a constitutional, that the coach goes, there is a constitutional right. Right. Okay. NEAP is from 1996. LR, which involved an incident from January 2013. But LR was decided much later, so LR is not related. LR was decided in 2016, and it involved an incident that occurred in 2013. But LR wasn't decided. And this is very important. So it's NEAP. It's NEAP. Yes. All the precedents that LR relied upon, saying that NEAP was the key case, predated November of 2011. So if you read LR. Two cases, NEAP and what was the other case? What are the cases that LR relied on? Yeah, that LR relied on, NEAP and what else? LR relied upon a series of cases, two from the Seventh Circuit, also from before 2011, one from the Ninth Circuit, one from the Tenth Circuit, I believe. But they were also, weren't they involving children? A lot of them had to do with extremely vulnerable situations. Again, the total common sense situation. Maybe you're going to say, well, this is a total common sense situation. Right. I think the viewing the facts in the light most favorable to the plaintiff, which is what the summary judgment standard requires, that that's a common sense situation. We're to define this issue at a, and NEAP was decided before the Supreme Court, really made clear that you've got to be very specific and context-specific in defining the right at issue. Right. Absolutely. And LR says, based upon pre-November 2011 precedent, that the specific right at issue there is an individual's right not to be removed from a safe environment and placed into one where it is clear that harm is likely to occur, particularly when the individual may, due to youth or other factors, so it doesn't just cover only kindergartners, be especially vulnerable to the risk of harm. And LR decided in December of last year, of course, was decided after the Supreme Court had made clear that you can't have the right to find it too high of a level of generality. We submitted to Member Stanford briefs that LR should control here. LR also talks about abandoning a private citizen in a dangerous situation. Which was me. You know, and football is inherently dangerous, and the parents here signed basically a waiver saying, we know concussions can happen, and this is inherently dangerous, and it's okay for our kid to do that. So nobody's abandoning this child, and, you know, in a dangerous situation that maybe the adult in LR could appreciate but the child couldn't, the police in NEEP could appreciate but the drunk lady couldn't, here everybody understands what's going on. If in the case there was only a single hit, which is a theory that the coach is testifying to as his version of the facts, I think it would be very difficult for the plaintiff to recover. But if this is a situation based upon all the other testimony that the plaintiffs rely upon, that Sheldon Mann was clearly incapacitated and helpless, then we think it does fall into that category. And I hate to try to pile on to the facts of LR, but as we observed in our reply brief, if you think about strangers who are going to go to a school and try to take out a kindergartner who's not the parent, there are certainly any number of people other than a parent that may be trying to take a kindergartner out of school, a relative, a neighbor, something happened to the parent. The parent calls in and says, you know, somebody else is taking out my child. The theory that someone is going to be stealing someone from kindergarten to my college is not something that's actively happening on a regular basis at the schools of Philadelphia. But it's also something that a teacher does not do. It's what they've been doing for years, even back then. And Coach Volkoviak testified that letting someone who's defenseless back into play is not something that a football coach does. And this case demonstrates the horrific injury that can follow. I don't want to deprive us from talking about qualified immunity, but there's also a municipal liability claim in this case. But there's no, I mean, municipal liability is, you know, something that happened over and over again. Here there clearly were policies to take the child out after they had a concussion, and there's no evidence that that, you know, wouldn't have been followed. It doesn't matter what it's called. The custom usually is something where there's multiple situations. The school district did not have an actual concussion policy until 2012. But they had a policy in their regular policies that said, so they don't have a specific concussion policy. The policy was if someone appears to have suffered a concussion, they're not going back in. Isn't that what you wanted to be the policy? What did you want in the way of policy? Well, there was an adequate policy after in 2011. I think it may just be a case of pleading in the alternative where, you know, if in fact the coaches were not aware, if they weren't aware of what to do, the reason is because the policy was inadequate. And the type of expert testimony the plaintiff came forward with is, in our view, the same as in those three cases that we cite where the court found that expert testimony was sufficient to get to a jury. Two of them involved prison situations, and the third involved. Is the fact that Coach Wachowiak went through concussion training at DeSales University prior to the 2011 season relevant on a municipal liability claim? We don't believe that it is, Your Honor, simply because that was not the policy. There were other coaches there as well. So for this claim, it involves more than just Coach Wachowiak. Nobody intervened. Thank you, Your Honors. Thank you, Mr. Spence. You have a busy week, Mr. Spence. And it's not over yet. Why isn't Mr. Bashman correct that looking at the evidence in the light most favorable to the plaintiff, which we have to do for our purposes, and by the way, you complain about the finding of the district court that the state created danger was satisfied, but you did not cross appeal, did you not? I did not, Your Honor, but we rely on that as an alternative basis to affirm the court's holding below. You wanted to reverse on that. You wanted a reversal on that basis, did you not? Right. My understanding of the law, though, is that you can attack the reasoning of the court on other issues and raise them as an alternative basis to affirm without filing a cross appeal. I saw that you had a footnote to that effect. If this were to happen today, would you agree that, same allegations, would you agree that qualified immunity would not protect the coach? Your Honor, it probably would still protect the coach. Today? Today. Because there still aren't any circuit cases. With all that's going on in the NFL and high schools and Grammy schools. There is a lot of stuff going on outside, stuff outside of the judicial confines, but the Supreme Court precedent appears to call for a vigorous consensus of persuasive authority from the Court of Appeals, and there just isn't that in this context at this point. But if you define the right the way it's been defined by us, and as putting someone who's vulnerable in a dangerous situation, I mean, how much more do we need? Well, I disagree with that formulation of the right in this instance. But the way you want the right, it's so overly general. No, no, no. No, I mean, so overly specific is what I mean. Well, I think it has to be context specific. I think this has to be a right viewed in an athletic situation where there are. . . Athletic situation or football specifically? Or football specifically, but it could be other sports. It could be lacrosse, it could be hockey, it could be anything of that nature, soccer. But there have to be some symptoms of a concussion. Well, according to the most damning testimony, there are. Well, in this case, Your Honor, there is no evidence that shows that, well, Kojak knew that Sheldon had suffered a concussion. There is evidence that he saw him roll his shoulders. The coach himself said that the kid was stumbling around, he was semi-conscious maybe. There were other kids who said that. But there's no one that says that Coach Walkowiak saw that he was stumbling around. It's your fact. He said he saw the symptoms of a stinger. He said rolling his shoulder. He also said that can be a sign of a concussion. He did say that. He speculated that it could have been a stinger. That's Coach Walkowiak's exact words. But this isn't like other cases where there. . . These issues overlap that the behavior didn't shock the conscience. In the other cases where they didn't find it shocked conscience, there were incidents where the coach was told the person had a concussion, that the person was suffering from headaches, that you shouldn't put him back in, that there were all these other factors that were existing. But the district court tacked very close to a negligent standard here, which isn't the standard. And in this case, there is also an uncontradicted fact that Sheldon said he was okay after the alleged first hit. What's he going to say? Well, he's going to say he's okay. Coach Walkowiak put me in. I see that. Sure. But there's also the football players were told that if you suffer a concussion, you have to inform the coach. No disrespect, but a kid, 15 years old, playing football, as Judge Mendoza said, he doesn't want to label himself as a whip. He's going to say he's a slave of the money pipeline and the social intelligence for the Holy Grail, where the guardian has his arm cut off and he's standing there. . . Like the Fletch Boys. His legs are cut off saying he can't get past. He's not going to be in Israel. But in other cases they have, Your Honor. In other cases, the players have told the coach. I think the one was the basketball game. I forget what the exact name of the case is. Where the players actually told the coach, this girl is suffering a concussion here, but the coach ignored it and put him back in, and the court still found that that wasn't shocking. He relied upon the fact that the agent himself said he was fine as opposed to other kids coming over and saying. . . And no one told the coach that he wasn't fine. There's no facts indicating that any student ever told the coach that he wasn't fine or any other coach told the coach that he wasn't fine. All this stuff is happening and the coach is not paying attention to it and everybody else is seeing it and he's not. But he made a judgment that he did not suffer a concussion, and I think there's a similar case. But he knew there was a prior hit. After the first hit, that's where the nub is. The alleged first hit, there was no evidence that he was subjectively aware that Sheldon had suffered a concussion at that point, and no one had told him. . . We don't know whether he had or not. But he had had a hit that was serious enough to label it a stinger and that was known to the coach. A shoulder stinger, not a neck stinger, no one saw him get hit in the head. This was a judgment by the coach, and it's not shocking to the conscience to make a judgment that's supported by observations. And Sanford v. Stiles, it's not exactly analogous because it's not a sports situation, but it was a situation where a kid had wrote a suicide note where he said, I'm going to kill myself. And the guidance counselor knew that the child had written a suicide note, knew that he could possibly be suicidal, but determined, made a judgment call, that he wasn't. And that was not shocking to the conscience. That was behavior that was not shocking to the conscience. So we don't want to throw . . . we raised that very seriously, raised that issue. And we also want to make sure that the court understands that in previous cases, the Third Circuit has talked about that the shock of conscience standard should be more of a subjective standard and has expressed approval of that standard. And if that were to happen in this case, then the record surely shows that this behavior wasn't shocking to the conscience. I don't know that it's subjective, but it depends upon the . . . it's contextual for certain. It depends upon the situation. And, you know, we're replaying the football episode in slow motion, whereas football happens very quickly. And so when you say shock to the conscience . . . No, no, no, no, it doesn't. It's the ground . . . but for the ground. We're going to help that too. But, you know, whether it shocks the conscience or deliberate indifference, you know, and I think the court here said deliberate indifference, but shocks the conscience might be closer given the way a football game works. I don't know. But I'm not 100% sure that you, without a cross appeal, that we can undo the court's finding with respect to the essential elements of the state-created danger. I'm not sure. I say it a lot in my brief. That would be up to the court, of course. Your Honor, briefly on the municipal liability question . . . How would you frame the right? I did write it down here because I figured you were going to ask that question. You should have memorized it then. I'm memorizing too many things this week. Understood. I would define it in a way that talks about, like we had talked about earlier, that it is a . . . I have it right here. Sorry. I have it here, page three of my question. Let's see. A student athlete's constitutional right to be freed from being ordered to resume practice or play after sustaining a major hit and displaying a concussion-related sentence . . . That was the way that the plaintiff described it in their brief, and I was just quoting what they had described earlier in their brief. I think it's page 18, I think, of their brief. This is in the red brief at page 48. Right, and I think I cite it from their brief. That's where I got that quote from. I do think it has to be context-specific. It can't be so general as they find it in their appellate brief, which is different than they defined it below. They defined it below like was defined in the Shoto case, which the Spade case found wasn't clearly established as of 2015. That's how they originally defined it. They changed that. Our argument in our brief is that they have waived the right to define it the way they defined it on appeal, which is completely different than how they had defined it below. Is there any combination of facts that are on the record, from which you, when you say something like that, it has to be where you live? You shouldn't ask the question. You should probably ask Mr. Basham. But it does seem to me that, assuming that there were other coaches who saw what happened to this young man and became very concerned after the first hit that this kid may not be able to defend himself, and that was the terminology that Mr. Basham used, that he was helpless. If that's the case, and the coach says, well, go back out there anyhow and subject yourself to getting another hit in the head. He didn't say that, obviously, with his words, but his actions express that. Why wouldn't that be enough, no matter how you define the right, to get past qualified immunity, at least to get it to the jury and let the jury decide that? Because, again, there isn't a consensus of persuasive authority that would say that he was violating a constitutional right when he did that. That's the standard that the Supreme Court has set, and that's the standard that the lower court applied. And I don't believe that there is going to be any evidence on this record that a coach ever said that in this case. As a matter of fact, I think the coach who was closest to the plays and observed the plays said that he noticed nothing and that he went back in for 25 plays and he looked fine. But, again, getting back to your question, there is no persuasive consensus of court of appeal authority. This court might be the first to actually set forth some standards in this area. So, unless the court has any other questions, I just ask the court to affirm the lower court, and I thank the court for its time. Thank you. Thank you. Now you're done. You said at the beginning you weren't done yet.  I'm sorry, Judge? Now you're done. You said at the beginning you weren't finished yet. Now you're finished. Mr. Bachman, what's, factually, what's the most damning evidence as to what the coach knew and observed, knew or observed at the time? The coach said to another coach after the accident occurred that there were two hard hits. There were two hard hits, okay. Everyone else who was there. But he didn't say. Let's get into the subjective. And, you know, after the first one, I was wondering whether he was going to be all right because he was wobbling. He didn't say. Let me get into that subjective issue. In police officer cases where no one is in the position of the police officer, for example, having to respond to a life or death situation, it is very important what could be known to the official. In this case, the record is replete with eyewitnesses who had the same access to the scene visually as the coach. So then you're making a credibility determination that the coach actually saw more than he testified to. The coach also is on the sideline and the game is going on right here. There's people, you know, we know from common sense that on the sideline of a football game, the coach isn't looking all around. He's looking at the play and everybody else is milling around. So, you know, there's not a whole lot of, you know, if normally a coach would be sitting behind kind of in a bleacher, then maybe we doubt and say, oh, certainly he had to see. But here. Well, it says he saw the first target and then he went over to check on Sheldon.  And then it says. Sheldon said he was fine. I was on dispute of the fact that Sheldon said he was fine. The coach says that, but I haven't seen that said by anyone else or by anyone for the plaintiff who concedes that. In the concussion cases. But what is the most damning as to what the coach actually saw? The fact that he said he saw that he went over to check on him and that everyone else is reporting on what they saw at that same time frame. And they said they saw what? They said they saw the wobbling. That he was disoriented. Right. I had the whole list, which I left back at council table. But we don't have testimony that the coach observed that. And that is at the nub of the factual dispute, whether the coach recognized he was helpless or not. Everyone else recognizes he was helpless under the circumstances. And the cases on which the other side relied upon for finding qualified immunity where students had suffered concussions were all cases where the concussion was suffered weeks before. And the parent had called the coach and said that the kid has been cleared to go back to practicing. And the kid was worried about it. And the coach said, you know, come on, get back out there. Your parent said you were fine. None of those cases is a situation where after a serious injury takes place, the coach on the spot on his own says, you know, get back out there. Those cases were all significant period of time cases. The way that we define the right, as the court is aware, is exactly how it was defined in L.R. In the L.R. case itself, the plaintiff had never defined the right in those words. That L.R. wasn't decided in 2011. Right. We've been over that. And you're correct. It does rely upon the pre-2011 precedent entirely and no post-2011 precedent. It's hard to kind of put your head back into the time before the NFL case. It's very difficult. Thank you, Your Honors. We ask that the court reverse. Thank you, Mr. Baskin. This has nothing to do with our deliberation. But was the negligence action brought against either the coach or the school in state court? Is it relevant for our consideration? I'm not familiar with the answer being yes, but just because there's other issues under state law, no doubt. Okay. Yeah, I guess it would be. Any issues under state law? Correct. Yeah. Correct. Thank you. Thank you. I think we met at an advisory. Thank you. Thanks very much. Thank you. Wow. It's not us, not me.